Mrs. John R. Siegel, et al., Plaintiffs-Appellants, Cross-Appellees, v. City of Chicago, a Municipal Corporation, Defendant-Appellee, and Lincoln-Pratt Building Corporation, an Illinois Corporation, Wells North Corp., an Illinois Corporation, Seymour Stein and Lester Stein, Defendants-Appellees, Cross-Appellants.

**Gen. No. 54,365.**

First District, Second Division.

June 23, 1970.

Rehearing denied July 15, 1970.

L. Louis Karton and John B. Cashion, of Chicago, for appellants.

Richard L. Curry, Acting Corporation Counsel of City of Chicago (Marven E. Aspen and Edmund Hatfield, Assistant Corporation Counsel, of counsel), for appellee.

MR. PRESIDING JUSTICE McCORMICK delivered the opinion of the court.

Mrs. John R. Siegel, James Ward, Johanna Walsh Ward and Mrs. E. Page Townsley, plaintiffs, are owners and/or residents of property situated on Eugenie Street between Wells Street and North Park Avenue, in Chicago. The defendants will be referred to as the Stein defendants; the property in question as the Stein property; and the City of Chicago as the City.

The Stein property is presently vacant and is being used as a parking lot and gas station. The frontage on Wells Street is approximately 163 feet, and the lot size is between 54,000 and 55,000 square feet. The property is located on the west side of Wells Street between Eugenie and North Avenue, with North Park Avenue the first street to the west. When the Stein defendants first

became involved in the property, approximately three years prior to 1968, it contained several structures which were demolished to make way for the parking lot at 1638–1646 North Wells Street which the Stein defendants now own.

Planning to build a high-rise apartment on the property, with a higher density than allowable under their old zoning classification, the Stein defendants sought and obtained a rezoning of their property by an amendment to the Chicago Zoning Ordinance which was passed on May 28, 1968. It had been zoned C1–3 and C1–4 Restricted Commercial Districts; the amendment placed the property in a B4–5 Restricted Service District. Four property owners adjacent to the subject property instituted an action for declaratory judgment seeking to nullify the amendment. After the plaintiffs' complaint and first and second amended complaints were struck on defendants' motions, the case was tried on the plaintiffs' third amended complaint, and the trial court struck plaintiffs' jury demand. At the end of plaintiffs' evidence, the judge entered judgment for all the defendants. The plaintiffs have brought this appeal from that judgment.

The Stein defendants had filed a counterclaim which alleged in substance that Count II of plaintiffs' suit amounted to an abuse of process. The trial judge dismissed that counterclaim and from that order of dismissal the Stein defendants have filed a cross-appeal. They further cross-appeal the trial court's ruling in permitting plaintiffs to file their amended notice of appeal after the original notice of appeal was struck on defendants' motion.

We shall first consider the appeal of plaintiffs. Their primary argument is that the amendment which was allowed to the defendants constituted an act of spot zoning and it was, therefore, erroneous for the trial court

to have entered judgment for the defendants. Much of plaintiffs' argument is based on their assertion that the amended zoning classification of the subject property was not in accord with the comprehensive zoning plan of the area enacted in 1957, and in support of this position the following is contained in the plaintiffs' brief: "The last comprehensive zoning ordinance was enacted by the City in 1957. There were no physical land use changes in the specific block where the Stein property was located in the 11 years after the 1957 comprehensive ordinance."

Philip Zeitlin, a city planner for the City of Chicago, testified at the trial that he had visited the area in question, and he was asked if he recalled seeing any changes of physical land uses on the west side of Wells Street near Eugenie. He said that although he could not recall specific changes, there had been some. This court's attention has been directed to Zeitlin's testimony, which was alleged to have supported plaintiffs' assertion of "no changes" in the block where the Stein property is located. However, it appears to us that Zeitlin's testimony stands for precisely the contrary proposition.

Jared Shlaes, a Chicago real estate developer and one-time resident near the Stein property, described the area of Wells Street involved in the litigation as an old commercial street of specialty shops and night clubs. He testified that since the passage of the 1957 comprehensive plan, there had been no material changes between Eugenie Street and North Avenue except the removal of several structures to make way for parking. He further testified that Eugenie was an unusually attractive residential street, characterized by elegant Victorian structures. It was his opinion that the construction of a high-rise apartment building on the Stein property, with the allowed density of the amendment, and with parking facilities for 500 automobiles, would decrease the property values on Eugenie by ten to fifteen

percent. Shlaes admitted that he had served as broker and developer of a 24-unit apartment building at the southeast corner of Eugenie and North Park Avenue.

Mrs. Johanna Walsh, the only plaintiff who testified, stated that she lives at 225 West Eugenie Street; that Mrs. Townsley, a plaintiff, lives two doors west of her; and that Mrs. Siegel lives four doors east across the street from her. She said that she and her husband had purchased their home several years ago, and at the time of trial had lived there a little over two years.

A summary of all testimony heard at the trial regarding the ownership interest of plaintiffs is Mrs. Walsh's statement that she and her husband had "purchased" their home, her declarations that Mrs. Siegel and Mrs. Townsley "live" on the same block, and one statement that Mrs. Siegel "owns property" on Eugenie. In the trial court no objection was made to the lack of proof of ownership sufficient to satisfy standing requirements, so we will not dwell on that point. Plaintiffs' assertion in their brief before this court that they "are adjoining landowners" is rather extreme in the light of the "proof" offered to verify the matter. See Clark Oil & Refining Corp. v. Evanston, 23 Ill2d 48, 177 NE2d 191.

Thompson A. Dyke, a professional city planner, testified that he was familiar with the area in question and described it as having residential character with small structures of no more than four stories. He was of the opinion that a high-rise on the Stein property would not be in the best interests of the neighborhood.

Plaintiffs argue that the amendment is a departure from the normal zoning pattern of the area, and they point out that the adjacent property on both sides of the Stein property was not rezoned. The relevance of this fact of inaction is not clear to us. While it may be perfectly true that there have been no other zoning amendments in the area, it could also be true that no other property owners have ever sought an amendment.

91

The mere statement that there have been no other amendments, without a showing that such had been applied for and denied, and without sufficient proof that the change is detrimental to the community, is without effect.

█ Plaintiffs seek to gain support from Zeitlin's testimony by asserting that it establishes that in the subject area no amendments had been made in the zoning pattern since 1957, and therefore, the amendment granted to Stein defendants was unjustified. This reasoning would suggest that once a zoning pattern has been established, it can never be altered, since any deviation therefrom would be arbitrary and, therefore, illegal. We will not approve such a view. Even the Constitution of the State is subject to amendment, and it would be absurd to say that a legislative enactment could be held to be forever binding upon the same terms as originally established within the four corners of the document.

█ We cannot be unmindful of the fact that the amendment granted to the Stein defendants carries with it a presumption of validity since the amendment was a legislative act. See Cosmopolitan Nat. Bank of Chicago v. Chicago, 22 Ill2d 367, 372, 176 NE2d 795; Jans v. City of Evanston, 52 Ill App2d 61, 67–68, 201 NE2d 663. Before a legislative decision will be overturned by a court, the party seeking such court action must prove by clear and convincing evidence that the legislative action was unreasonable and arbitrary and bears no reasonable relation to the public health, morals, safety and welfare. Bennett v. City of Chicago, 24 Ill2d 270, 274, 181 NE2d 96; Atkins v. County of Cook, 18 Ill2d 287, 293, 163 NE2d 826. This burden is heavy and is not met by simply putting on witnesses who testify, in effect, that if they had had the authority they would not have granted the amendment.

In Reskin v. City of Northlake, 55 Ill App2d 184, 204 NE2d 600, the plaintiffs wanted to erect a gas station

on their lots 30, 31 and 32, which were all adjacent to one another, each 60 feet wide and 125 feet deep. Lot 32 was zoned to permit the erection of a gas station, while lots 30 and 31 were zoned to disallow gas stations. The master had concluded that the city's zoning ordinance was unreasonable and void insofar as it prevented plaintiffs from erecting a service station on lots 30 and 31, and the Circuit Court adopted the master's recommendation, and entered judgment for the plaintiffs. This court reversed the judgment, finding [at page 189],

> "that the effect of declaring defendant's residential zoning ordinance invalid as it applies to lots 30 and 31 would have the same consequence as 'spot zoning' *by permitting this* two-lot *encroachment* of the manufacturing zone *into an otherwise solid and regularly rectangular residential zone.* To constitute spot zoning . . . the two requisites which must coexist are: a change of zone applicable only to a small area, and a change which is out of harmony with comprehensive planning for the good of the community as a whole." [Emphasis supplied.]

At page 193 of the opinion, the court again pointed out its concern with the encroachment into one zoning area of a different pattern: "The subject property (lots 30 and 31) is characterized by the homogeneous, compact and uniform residential area to the east and northeast and not by the commercial and manufacturing areas."

This leads us to inquire as to the character of the community involved in the present litigation. The first thing we would note is that there does not exist in this case the kind of "homogeneous, compact and uniform" zoning pattern as was involved in Reskin. Zoning maps which form a part of the Chicago Zoning Ordinance show that on the northernmost strip of the south side of North Avenue are B4–4 and B4–5 zoning districts around

93

North Park Avenue, Wells Street and LaSalle. On the north side of North Avenue, one block east of the subject property, there is a large B4–5 zone; on the block of the subject property itself are two C1–4 and one C1–3 zones, while the northwest corner of Eugenie and North Park Avenue is R5.

Another feature which should not be overlooked is that even the prior zoning classifications of the Stein property would have permitted the construction thereon of a high-rise apartment building. The first statement in the permitted uses of the C1–1 to C1–5 districts, inclusive, is:

> (1) Any use permitted in the B4–1 to B4–5 Districts inclusive, as set forth in Section 8.3–4B with the exception of day care centers unless otherwise set forth or superseded hereinafter.

Furthermore, there exist no height restrictions within the zoning classifications here under consideration. As previously noted, Thompson A. Dyke testified for the plaintiffs, and on cross-examination, he was asked whether the presence of a high-rise building on the Stein property would cut off light and air of the adjoining residence property. He first answered that it would, although he subsequently modified that by saying that a tall building on the subject property would be out of harmony with the Lincoln Park project. We find the following series of questions and answers instructive:

> Q. "Are you familiar with the limitations under the C1–4 for a building business uses on the ground floor and apartments above it?"
> A. "Yes."
> Q. "What is the height limitation?"
> A. "It is a floor area ratio, it is not a height limitation."

Q. "So that under the C1–4 there is no height limitation?"

A. "I would say there is not a height limitation in the normal sense of zoning terminology. There is one in the sense of using floor area ratio as a limiting factor."

Mr. Dyke's responses require some explanation. Under a C1–4 classification, the floor area ratio is 5.0, whereas under a B4–5 classification, the floor area ratio is 7.0. In practical terms this means that the B4–5 zoning allows more people to live in the same overall area than are allowed under a C1–4 zoning. Thus, Mr. Dyke was saying that the only method by which height is restricted is indirectly, through density control. In one sense, his testimony hurts the plaintiffs' case, since he had testified that he favored a zoning pattern in the subject area which would keep down the height of apartment buildings. When asked, "If a 20-story building were constructed under the B4–5 as against a 40-story building under the C1–4, which would be the better zoning classification?" Mr. Dyke responded, "I would rather see 20 than 40 in the first place." He then admitted that if a B4–5 would reduce the height it would be a better zoning classification than a C1–4. Even under the old zoning classification, a high-rise could have been built; therefore, the objection to the amendment seems far less compelling than it would have been if the amendment allowed a totally new use of the property.

Mr. Dyke also read into the record the permitted uses under classifications ranging from C1–1 to C1–5, among which are horse stables, archery ranges, shooting galleries, house trailer sales, retail sale of live and slaughtered poultry, stadiums, auditoriums and arenas, with a maximum seating capacity of 2,000 persons. As previously mentioned, Mr. Shlaes had testified that the

95

proposed project would, in his opinion, reduce the value of plaintiffs' homes by ten to fifteen percent. That figure is rather meaningless without some basis of comparison. We question how much the residences would have depreciated in value if the Steins had built an arena on their property with seating for 2,000 people, or a 40-story building with a lower density than allowed under the B4–5 zoning; and what was the effect on the value of plaintiffs' homes of the now existing parking lot and gas station? Mr. Dyke admitted that he would prefer to see the proposed apartment building go up than an animal hospital, which could have been built under the C1–4 classification. He also insisted, when asked directly, that a C1–4 was better for the Stein property than a B4–5, although his answers to less direct questions continually pointed out that the C1–4 would have allowed for many uses which were far less desirable than the proposed apartment building under the B4–5.

Before the City Council passed the amendment which altered the zoning classification of the Stein property, hearings were held before the Committee on Building and Zoning. At those hearings in the spring of 1968, the Steins testified regarding their proposed use of the property. Some residents of the area testified, some favoring, some opposing, others apathetic to the proposed use. On May 28, 1968, the City Council approved the application and rezoned the property to B4–5.

██ ██ We have concluded that the plaintiffs have not overcome the presumptive validity of the amendment. Our reading of the record discloses that the plaintiffs' witnesses testified that they disagreed with the City Council's action. That is not a sufficient reason to justify judicial interference with the legislative enactment. In Zilien v. City of Chicago, 415 Ill 488, 114 NE2d 717, the court said at page 492:

"In approaching the problem it is to be borne in mind that ordinances duly enacted lie behind the bul-

wark of presumptive validity and the burden is upon the one assailing them to overcome that presumption. Because of this presumption, we have consistently held that it must be clearly and affirmatively shown that the ordinances attacked are unreasonable and capricious, as claimed, *for we will not upset the municipality's action where there is room for a fair and debatable difference of opinion on the question*." [Emphasis supplied.]

In that case, the court concluded there was no debatable difference of opinion over the municipality's amendatory zoning action. Evidence disclosed, among other things, that in eight consecutive blocks the zoning pattern alternated in a leap frog pattern between business and commercial uses and that the plaintiff's property was thus rezoned from what it had previously been, by a process appearing to be dictated more by chance than reason. No such arbitrary process is involved in the case before us, and we hold that the trial court properly ruled that plaintiffs had failed to prove a case of spot zoning.

The plaintiffs had demanded a jury. After much preliminary discourse between the trial court and counsel for plaintiffs, the judge struck the jury demand because he felt there were no triable issues of fact and because he believed that when the plaintiffs requested "other relief" they were asking for an injunction against the proposed use. Since he felt that the relief requested was equitable in nature, there existed no right to a trial by jury.

■ The plaintiffs have cited cases in this court which deal with the issue of the right to a jury trial. However, we feel that a review of the cases cited is unnecessary. At the close of plaintiffs' evidence the trial court entered judgment for all the defendants, and it is our opinion that this was correct, since the plaintiffs failed to prove their case. Accordingly, had a jury

been sitting in the case, the judge, at the close of plaintiffs' evidence, would simply have directed a verdict for the defendants, rather than entering judgment. In other words, the case would never have gone to the jury even if one had been impaneled, and it would thus be absurd for this court to reverse the case on the ground that plaintiffs were deprived of their right to a jury.

The plaintiffs also complain that the rezoning was tantamount to the granting of a special privilege contrary to article IV, section 22 of the Illinois Constitution, and in their brief they argue as follows:

". . . it would seem that if the Stein property warranted a zoning change, then other properties within this same exact zoning district also are entitled to the same change. Since the Stein property alone received the benefit of the redesignation, the Stein defendants have obtained a special privilege which is forbidden by our constitution."

We reject this argument on two grounds. First, there was absolutely no evidence to indicate that other property owners in the area had applied for rezoning, and consequently, there is no basis for the statement that the Steins were treated more favorably than other owners would have been had they made similar applications. Second, even if others were denied the right to rezoning while the Steins were not, that fact alone would not make out a case of special privilege. There may well be many rational bases upon which a legislative body may grant one party its requested relief and deny the same relief to another. It would be an unacceptably restrictive rule which would compel a legislative body to be bound by an "all or nothing" proposition. When a city council decides that one change would be desirable for the welfare of the community, it does not mean that it is bound to allow the same change for everyone.

Common sense dictates the necessity for affording latitude in the legislative process, with the caveat that the power entrusted to such bodies be not wielded arbitrarily.

Count II of plaintiffs' original complaint pleaded an action for fraudulent concealment against the Stein defendants, and sought $500,000 in damages. The count was stricken and the plaintiffs urge that the striking was error. We disagree with the plaintiffs. In Count II plaintiffs alleged, among other things:

16. That the defendants, LINCOLN-PRATT BUILDING CORPORATION, an Illinois corporation, LESTER STEIN, SEYMOUR STEIN, and their attorney, WILLIAM GOODSTEIN, and each of them, failed to disclose at the aforesaid hearing that certain land adjoining said property and comprising approximately 165 linear feet of frontage on the east side of North Park Avenue were intended to be an integral part of the proposed erection and construction of an apartment building on the aforesaid property.

17. That said land was and still is zoned in an R-5 classification.

18. That at the time of the aforesaid hearing, said land was to be used by said defendants for purposes of driveways, pedestrian walkways and delivery and residence entrances of the proposed apartment building.

19. That at the time of the aforesaid hearing, certain structures located on said land were in the process of being negotiated for and acquired by the defendants.

20. That at the time of the aforesaid hearing, certain structures located on said land had already been acquired by and were already owned by the defendants.

21. That the failure of defendants to disclose at the meeting before the Committee facts concerning the actual intended use of R–5 zoned properties contiguous to the aforesaid described property . . . was a fraudulent concealment by the defendants, and each of them.

22. That the Committee would not have recommended to the Council that the proposed ordinance rezoning the aforesaid described property to pass had the members of the Committee been informed of the above-described facts which were concealed.

The R–5 zone referred to by the plaintiffs was the property on North Park Avenue, which was in an R–5 zone as of the date of the trial, and as far as this court is aware (according to the most current Zoning Ordinance maps) it is still zoned R–5. We fail to understand the relevance of the Stein defendants' plans for the North Park property. Even if the allegations were true, we do not see why the defendants' silence regarding their proposed use of that property would constitute fraudulent concealment before the Committee. We do not feel there was an affirmative duty on the part of the defendants to volunteer information regarding their intended use of the North Park property, even if they contemplated any such plans. The lot under consideration was the one currently in use as a parking lot and gas station, and not the property referred to in plaintiffs' Count II. If the defendants have some plan in mind for the North Park frontage which will require another zoning amendment, then the time for disclosures regarding that property will be at the hearings specifically concerning it.

 Whether or not there are such plans for acquiring the amendment or otherwise dealing with the property, it was irrelevant to the specific question of whether or not the City Council should have passed an amend-

100

ment altering the zoning on the Wells Street frontage property from C1–3 and C1–4 to B4–5. The pleadings do not even allege that the defendants had been asked specific questions and had given false answers about the North Park property. They only state that the defendants did not volunteer information regarding their plans for the North Park property, and further plead a conclusion in paragraph 22 from the "fact" of the "concealment"; however, even though such a conclusion was pleaded, no such volunteering of information was required of the defendants. The trial judge properly struck Count II of the plaintiffs' complaint.

Plaintiffs also make a frontal attack on the Chicago Zoning Ordinance, urging that those sections of the ordinance relating to zoning amendments are void for vagueness. The thrust of this argument is that there exist no standards which could serve as a guide to the granting or refusal to grant an amendment to the ordinance. The section on amendments in the ordinance appears in Article 11, commencing with § 11.9–1 and proceeding through § 11.9–8. Plaintiffs argue that a reading of the amendment sections discloses no standards which are to be taken into account in determining whether or not to grant an amendment to the Chicago Zoning Ordinance. The ordinance cannot be read in a vacuum. Section 11–13–1 of chapter 24, Ill Rev Stats 1967, enumerates zoning objectives:

> "To the end that adequate light, pure air, and safety from fire and other dangers may be secured, that the taxable value of land and buildings throughout the municipality may be conserved, that congestion in the public streets may be lessened or avoided, that the hazards to persons and damage to property resulting from the accumulation or runoff of storm or flood waters may be lessened or avoided, and that the public health, safety, com-

fort, morals, and welfare may otherwise be promoted, the corporate authorities in each municipality have the following powers:"

Plaintiffs admit that this section enumerates "certain basic objectives of zoning," but they feel that this is inadequate. The amendment power is specifically granted by section 11–13–14, but the power to amend is governed by the same standards as set out in the objectives section 11–13–1, quoted above. We believe that 11–13–1 sets out sound police power objectives and provides workable standards from which a legislative body may work.

Article 2 of the Chicago Zoning Ordinance also establishes standards; however, above and beyond these standards there remains the judicial power to review legislative enactments to insure that such enactments meet the requirements set out in the earlier part of this opinion. It is interesting to note that plaintiffs do not complain that the standards regarding initial zoning classification are void for vagueness, and yet the same standards that control initial classification also control amendatory zoning.

The Chicago Zoning Ordinance does contain express standards which govern decisions regarding variations, but without such assistance the legislative body would have no idea as to the criteria it should employ in deciding whether or not to grant a variation. These are granted because it is recognized that there may be "practical difficulties or particular hardships in the way of carrying out the strict letter of the regulations . . . ." Chicago Zoning Ordinance, § 11.7–1. Accordingly, it establishes standards for variations. Amendments, on the other hand, are controlled strictly by the regulations. Thus, the legislative body, in determining whether an amendment should be allowed, need only

look to the objective section of the enabling statute (Ill Rev Stats 1967, c 24, § 11–13–1), and to Article 2 of the Chicago Zoning Ordinance, which sets out in detail the intent of the ordinance and the purposes sought to be established.

■ We feel that these sections are sufficiently explicit to advise one what his rights will be. That is not to say that one will always be able to foretell whether an amendment will be allowed. There remains an important permissible range of discretion which must be exercised by the legislative body. Our standard of review is to determine whether or not the legislative action was arbitrary and unreasonable. We hold that the zoning standards here attacked are not void for vagueness, based upon our reading of the amendment sections of the Chicago Zoning Ordinance (§§ 11.9–1 to 11.9–8) together with Article 2 of the ordinance which sets out the intent and purpose of the law, and with § 11–13–1 of the Illinois Municipal Code, which appears in chapter 24 of the Ill Rev Stats and establishes, among other things, the objectives of zoning law. These standards afford sufficient clarity to all concerned, but at the same time are flexible.

■ The plaintiffs urge that the City Council's passage of the amendment constituted an abuse of discretion. They first contend that this court should review the transcript of the hearings before the Committee to determine whether due notice and a proper hearing were had. They never openly complained to this court that they did not receive due notice, nor do they question that a proper hearing was had. In fact, they were represented by counsel at the hearing, at which time several owners of contiguous property and several neighborhood associations appeared. We are told that the dictum in Anthony v. City of Kewanee, 79 Ill App2d 243, 223 NE2d 738, is authority supporting our right

to look into the Committee proceedings. In that case the court said at page 247:

"The courts are without power to inquire into the wisdom of an ordinance or the motives which prompted its enactment with the possible exception that municipal ordinances may be impeached for fraud by persons injuriously affected thereby."

We have previously rejected plaintiffs' argument regarding their allegation of fraud on the part of the defendants; thus, the Anthony case is inapplicable.

The plaintiffs would also have this court examine the Committee proceedings which we are told would reveal "such a paucity of factual information" that we would be led to the conclusion that any vote favoring the amendment must have been inherently unreasonable. The answer to this also lies in the Anthony case, where the court said at page 249:

"The Board's reports or recommendations [in the present case the Committee's recommendation] are advisory only and it is not required that the evidence produced at the hearings support the Board's conclusion. More importantly, the municipal authority is acting in the performance of its legislative function and the propriety of the exercise of its discretion is not dependent on the adequacy or sufficiency of its knowledge or of supporting evidence. . . . In the instant case the validity of the ordinance is presumed and such validity does not depend on the evidence presented at the hearings before the Zoning Board of Appeals."

The plaintiffs' last argument is that the trial court improperly dismissed one of the party-defendants. That point is mooted by our disposition of the case since we are affirming the judgment.

104

█ The defendants have filed a cross-appeal from the trial court's dismissal of their counterclaim and from its order allowing plaintiffs to file an amended notice of appeal after their first one was stricken on the defendants' motion. The counterclaim contains three counts, the first one alleging that plaintiffs had maliciously abused process. Defendants state:

> "There are two essentials to an action for abuse of process: an ulterior purpose and an act in the use of legal process not proper in the regular prosecution of the proceedings. Dixon v. Smith-Wallace Shoe Co., 283 Ill 234, 119 NE 265; Bonney v. King, 201 Ill 47, 66 NE 377; Ammons v. Jet Credit Sales, Inc., 34 Ill App2d 456, 181 NE2d 601."

Defendants' allegations fail to plead an improper act in the use of legal process, although the counterclaim does contain allegations of ulterior purpose. Therefore, the trial court properly struck Count I.

█ Count II alleges malicious prosecution, and Count III alleges injury to reputation, credit and property resulting from malicious filing and prosecution. The defendants do not argue with the proposition that they must allege all essential elements, but they urge that they have done so. One of the elements which must be properly alleged under Counts II and III is the suffering of injury or damage as a result of the action or prosecution complained of. Schwartz v. Schwartz, 366 Ill 247, 252, 8 NE2d 668; Caspers v. Chicago Real Estate Board, 58 Ill App2d 113, 117, 206 NE2d 787. In the Caspers opinion the court concluded that special damages were not sufficiently alleged, and at page 120 quoted from Schwartz v. Schwartz, supra, as follows: "There are no allegations of 'special loss to him of any character, over and above the ordinary expense and trouble attendant upon the defense of an ordinary civil suit.' "

105

In the case before us the defendants allege that as a result of plaintiffs' having filed Count II of their complaint the defendants were damaged "in that financing which they were negotiating has been refused as a direct consequence . . . ." In support of the allegation they attached a letter to the pleading which they had received from a mortgage banking firm, advising the Steins that a loan of $225,000 which had previously been approved was refused "at this time due to the fact that our Credit Bureau Associates say that the principals involved are in litigation as shown by a matter of public record in case 68–L–16711. . . . Should these adverse procedures be adjudicated, we shall then be happy at that time to reconsider a new application."

The case number shown in the letter is the docket number of this case in the Circuit Court. We think it significant that the letter does not state the loan was being refused because of the charge of fraudulent concealment; rather, that the Steins were involved "in litigation," and were being sued. The Steins never charged that Count I of the complaint was improperly brought, and they seek no redress from plaintiffs' filing of Count I. Rather, they assert that their financing was ruined because of plaintiffs' filing of Count II. The letter does not justify a conclusion that it was Count II which caused the Steins' difficulty, yet the letter was incorporated into the pleadings to verify that very claim. Its purpose is to do the opposite and leads this court to conclude that defendants' allegations regarding special damage are simply based on sheer conjecture and speculation. It follows that a material element of both Counts II and III of the counterclaim was not properly pleaded, and the trial court properly dismissed them.

One further point should be made regarding defendants' counterclaim. Generally, the party suing for a malicious prosecution must prove that the former pro-

106

ceeding terminated in his favor. There are exceptions to this rule which are not applicable here. See Prosser on Torts, 2d Ed (1955) § 99. There are four reasons for a showing of this requirement of legal termination; they are set out in March v. Cacioppo, 37 Ill App2d 235, 185 NE2d 397, at page 246. The reason with which we are here concerned goes to the question of probable cause. Presuming that the party suing for malicious prosecution did not have judgment entered for him in the former proceeding, he cannot sustain his charge that the plaintiff in that proceeding had no probable cause upon which to have instituted his lawsuit. He must show that that former proceeding terminated in his (defendant's) favor; of course, it does not follow that because he won at the former proceeding it was initiated without foundation, and that fact must still be proved. But if he lost at the former proceeding he cannot be heard to complain in an independent action that the former proceeding was brought without probable cause. This would amount to a collateral attack on the judgment.

The question in this case is whether the dismissal of plaintiffs' Count II was such a legal termination in defendants' favor as to satisfy the requirement of legal termination for the purpose of justifying the defendants' filing a suit charging malicious prosecution. Neither party to this controversy has cited Supreme Court Rule 273, which states: "Unless the order of dismissal or a statute of this state otherwise specifies, an involuntary dismissal of action, other than a dismissal for lack of jurisdiction, for improper venue, or for failure to join an indispensable party, operates as an adjudication upon the merits." Several aspects of this rule have been considered in other opinions. Mages Sports Arenas, Inc. v. Winston Park Shopping Center, 112 Ill App2d 409, 251 NE2d 334 (retroactivity of the Rule) ; Brown v. Schoenberg, 121 Ill App2d 342, 257 NE2d

■■■■■■■■■■■■■■■

539 (inapplicability of the Rule under the facts of the case).

■■■■ Under Rule 273 the dismissal of Count II of plaintiffs' complaint was an adjudication upon the merits. The question remains, however, whether it was an adjudication which legally terminated the cause in favor of the defendants, as the phrase "legally terminated" relates to suits for malicious prosecution. We think not. One purpose of the legal termination requirement is to lay the groundwork for showing that no probable cause existed for the institution of the former proceedings. Can it be logically said that the dismissal of a complaint for failure to state a cause of action indicates there was no probable cause to have filed the complaint? The trial judge said in a memorandum: "Could anyone logically argue that dismissal of a complaint because of lack of jurisdiction, lack of capacity to sue, pendency of another action, or statute of limitations should be prima facie evidence of a lack of probable cause?" The judge thought not, and we agree.

■■■■ We believe that the legal termination requirement necessitates a judgment which deals with the factual issue of the case, whether the judgment be rendered after a trial or upon motion for summary judgment. However, it is not sufficient to simply obtain a dismissal of the opponents' complaint, for such dismissal need bear no logical relationship to the legitimacy of the assertions contained therein; therefore, such dismissal lends no credence to the claim that the assertions were baseless. Thus, if the defendants had properly alleged special damage we would still have sustained the trial court's dismissal of their counterclaim because the dismissal of plaintiffs' Count II did not serve as a sufficient legal termination of the cause.

Finally, the defendants argue that the trial court improperly allowed plaintiffs to file an amended notice

of appeal. The first notice was stricken on defendants' motion because it failed to designate the court to which the appeal was being taken. That designation is required by Supreme Court Rule 303(c)(1)(i). On oral motion the trial judge granted plaintiffs leave to file an amended notice of appeal, pursuant to Supreme Court Rule 303(c)(4).

■■■ No complaint on this ground was made to this court until the defendants filed their briefs in the case. No motion was presented to us to dismiss the appeal on the ground of improper designation, and it is obvious that no prejudice resulted. The defendants point out that part of the reason for designation of the court requirement is so that both parties will know in which court to file their appearances, motions and other filings. After the error was rectified the defendants knew to which court the case was being appealed, yet they made no motion to dismiss the appeal. They have waived the issue by their delay. If they felt prejudiced by the trial court's ruling they should have moved to dismiss the appeal.

The judgment of the Circuit Court is affirmed in all respects.

Affirmed.

LYONS and BURKE, JJ., concur.